******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# RAY C. JOHNSON ET AL. *v.*
# VITA BUILT, LLC, ET AL.
## (AC 45123)

Prescott, Seeley and Eveleigh, Js.

*Syllabus*

The plaintiff property owners brought an action against the defendants, a contractor and an architect, alleging, inter alia, breach of contract. The plaintiffs owned real property in Westport and hired the defendants to design and build a new home on the property with the goal of selling the redeveloped property for a profit. During the course of their working relationship, the parties executed a contract for the construction of the new residence. Pursuant to the construction contract, the defendants agreed to design and construct the new home and provide related services for a fee. Later that month, the defendants agreed, by letter, as a part of the parties' ongoing discussions, to reduce their fees (fee reduction letter). More than one year later, the parties entered into a separate agreement titled "Additional Fee and Profit Sharing Agreement" (2019 agreement), which incorporated by reference the construction contract and the fee reduction letter. The 2019 agreement included a section titled "Additional Fee and Profits/Losses," which provided that the parties would share in "all profits . . . and all losses" associated with the sale of the property, defined "profits" as net profits and set forth in detail how net profits would be calculated, and provided that the previously reduced fees would be reinstated and that, after certain enumerated expenses were paid, any remaining funds would be allocated among the parties on a percentage basis. The 2019 agreement did not contain language defining the term "losses" or explaining how losses, if any, would be determined and calculated or apportioned among the parties. The property was ultimately sold at a loss, and the parties disagreed about what effect this shortfall meant relative to the parties' financial stakes as expressed in their contracts. The defendants claimed that they had no obligation under the terms of the 2019 agreement to share in any shortfall. The plaintiffs took the position that the "net profit" calculation, if made in accordance with the intent of the 2019 agreement, resulted in a negative number or "losses," which the parties had intended to share at the same percentages that they would have shared with respect to net profits. After the plaintiffs filed their application for a prejudgment remedy and commenced this action, the defendants asserted a counterclaim against the plaintiffs for breach of contract; in addition, they filed their own application for a prejudgment remedy. The trial court denied the plaintiffs' application for a prejudgment remedy, finding that there was no ambiguity in the contract language and that, read as a whole, it did not require the defendants to share in the loss attributed to the sale of the property. The court concluded that the defendants had shown probable cause that they would prevail on their counterclaim and granted the defendants' application for a prejudgment remedy. In the alternative, the court found that, even if there was ambiguity in the 2019 agreement, the parol evidence offered by the parties also supported a conclusion that the contract could not be interpreted reasonably to require the sharing of losses. In reaching its alternative conclusion, the court relied heavily on its factual finding that, as part of the 2019 agreement, the defendants agreed to risk, and ultimately lost, the fees owed to the defendants under the construction contract as modified by the fee reduction letter. On the plaintiffs' appeal to this court, *held:*

1. The trial court improperly concluded that the 2019 agreement unambiguously provided that the parties would share only in net profits and did not reflect an intent to share in all losses resulting from the sale of the property: although the 2019 agreement contained no definition for the term "losses" and was silent as to how the parties would treat a situation in which the proceeds from the sale of the property were insufficient to satisfy each of the enumerated categories of expenses, the parties' use of express language that the parties would share in all profits and

all losses associated with the property and their failure to define precisely what they intended by that language created a clear ambiguity in the contract that necessitated looking beyond the four corners of the contract to determine the parties' intent and, accordingly, the trial court's conclusion could not stand as a basis for finding that the defendants would prevail on their counterclaim.

2. The trial court relied on clearly erroneous factual findings in support of its alternative conclusion that, even if the contract was ambiguous regarding the parties' intent, the parol evidence offered by the parties established probable cause that the defendants would prevail on their counterclaim: there was no dispute that, contrary to the trial court's findings, the fees owed to the defendants under the construction contract as modified by the fee reduction letter never were at risk and, in fact, were paid in full to the defendants; moreover, although the defendants pointed to other extrinsic evidence in the record that may have supported the trial court's alternative holding, there was no indication in that court's decision to what extent, if any, that court considered or credited any other extrinsic evidence and, accordingly, because the court relied primarily on its erroneous factual finding in reaching its alternative conclusion, not the evidence advanced by the defendants, this court was left with no confidence in the trial court's assessment of probable cause that the defendants would prevail on their counterclaim; accordingly, the prejudgment remedy awarded could not stand and a new hearing on the defendants' application was warranted.

Argued October 5—officially released December 20, 2022

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendants filed a counterclaim; thereafter, the court, *Kavanewsky, J.*, granted the defendants' application for a prejudgment remedy and denied the plaintiffs' application for a prejudgment remedy and rendered judgment thereon, from which the plaintiffs appealed to this court. *Reversed in part*; *further proceedings*.

*William N. Wright*, for the appellants (plaintiffs).

*John J. Ribas*, with whom, on the brief, was *Bruce L. Elstein*, for the appellees (defendants).

*Opinion*

PRESCOTT, J. In this contract action arising out of the redevelopment and sale of residential property in Westport, the plaintiff property owners, Ray C. Johnson and Indre L. Johnson, appeal from the judgment of the trial court granting an application for a prejudgment remedy filed by the defendants, Vita Built, LLC (Vita Built), and Vita Design Group, LLC (Vita Design), after finding probable cause that the defendants will prevail on their breach of contract counterclaim against the plaintiffs.[1] The plaintiffs claim on appeal that the court improperly (1) misconstrued the relevant contract as unambiguously providing that the parties intended to share only in potential profits resulting from the sale of the redeveloped property, despite express contradictory language in the contract indicating that the parties would share in all profits and losses, and (2) relied upon clearly erroneous factual findings in reaching its alternative conclusion that, even if the contract language is ambiguous, the extrinsic evidence presented to the court favored the defendants' interpretation that the parties did not intend to share in all potential losses.

We agree that the court improperly concluded that the contract unambiguously provided that the parties would share only in net profits and did not reflect an intent to share in all losses resulting from the sale of the property. We also agree with the plaintiffs that the court made clearly erroneous factual findings in support of its alternative conclusion that, even if the contract is ambiguous regarding the parties' intent, the parol evidence established probable cause that the defendants would prevail on their counterclaim. Accordingly, we reverse the judgment of the court granting the defendants' application for a prejudgment remedy and remand for a new prejudgment remedy hearing.

The following facts, as found by the court or that are otherwise undisputed in the record, and procedural history are relevant to our resolution of this appeal. The plaintiffs owned residential property located at 281 Compo Road South in Westport. They acquired the property in 2007 for $2,428,000. By 2016, the plaintiffs had begun to formulate a plan to demolish the existing residence on the property, which, at that time, was valued at approximately $1,840,000, and to construct a new home with the hopes of selling the redeveloped property for a profit. In late 2016, the plaintiffs met with Lucien Vita to discuss their redevelopment plans. Vita was the controlling principal of the two defendant companies: Vita Built, a licensed new home construction and home improvement contractor, and Vita Design, an architectural firm specializing in residential properties. During their ongoing negotiations, the plaintiffs suggested to Vita that the defendants' involvement in the redevelopment would provide the defendants with positive publicity and marketing opportunities and

that the parties should discuss an agreement that reflected those benefits to the defendants.

In September, 2017, although the parties continued to negotiate some of the details of their financial arrangements, they executed a contract for the construction of the new residence. Pursuant to the construction contract, Vita Built agreed to construct the new home and provide related management services for a fee of $197,000, and Vita Design agreed to provide architectural plans and related services for an additional $197,000, for a total of $394,000. Later that month, the defendants, by letter, agreed as a part of the parties' ongoing discussions to reduce their fees as set forth in the construction contract (fee reduction letter). Specifically, each defendant agreed to reduce its fee by $63,000. As a result, the plaintiffs agreed to pay the defendants a combined total of $268,000. The fee reduction letter further provided that the estimated budget for the project was $2,300,700, which sum included the defendants' reduced fees.

On February 2, 2019, the parties entered into a separate agreement that was titled "Additional Fee and Profit Sharing Agreement" (2019 agreement). The plaintiff Indre L. Johnson drafted the 2019 agreement using as a template an earlier version of a profit sharing agreement drafted by the defendants' attorney. The 2019 agreement incorporates by reference both the construction contract and the fee reduction letter. It also includes an integration or merger clause that provides that "[the 2019 agreement] represents the entire agreement and understanding of the [p]arties with respect to the subject matter hereof, absent further agreement."

Section 7 of the 2019 agreement is the critical provision at issue in the present appeal. In relevant part, it provides: "Additional Fee and *Profits/Losses*. In consideration of the additional work and responsibilities associated with finalizing design and construction plans and details for marketing new construction to potential buyers under the Listing Agreement, Owner[2] has agreed to reinstate the fee reduction agreed to in the Fee Reduction Letter,[3] paying Architect and Builder the additional $63,000 in fees each, for a total of $126,000, according to the distribution which will be outlined below, at the time of closing of sale. Owner has also agreed to offer profit sharing should profits exist after distribution according to the allocation outlined below.

"Owner, Architect and Builder will share in all Profits (as hereinafter defined) *and all losses* associated with the Property as set forth herein. As used in this Agreement, 'Profits' shall be deemed the net profits with respect to the Property, calculated as the final sales price of the Property . . . less [certain enumerated expenses][4] . . . the payoff of the reinstated fees of $63,000 each to Architect and Builder (for a total of $126,000); and . . . the Owner's basis in the Property

of $1,450,000.00. Any remaining funds shall be divided as follows: twenty percent (20%) of the remaining funds shall be disbursed to the Owner, forty percent (40%) of the remaining funds shall be disbursed to the Builder and forty percent (40%) of the remaining funds shall be disbursed to the Architect."[5] (Emphasis added; footnotes added.) Although the 2019 agreement explicitly provides that the parties would share in "all losses," it contains no language defining the term losses or explaining how losses, if any, would be determined and calculated. It also does not specify how the losses, if any, would be apportioned among the parties.

The new home was completed in the early part of 2019. The plaintiffs, in consultation with the defendants, listed the property for sale at a price of $5,879,000. It sold on August 3, 2019, for $4,900,000, which was nearly one million dollars less than the original listing price. Calculating the "net profit" of the sale in accordance with the terms of the 2019 agreement, which included taking deductions for the $126,000 in additional fees that the plaintiffs had agreed to pay the defendants (reinstated fees) and the plaintiffs' $1,450,000 basis in the property, the result was a deficit of $563,530. The parties disagreed about what effect this shortfall in anticipated proceeds meant relative to the parties' financial stakes as expressed in their contracts. The defendants' position was that the sale had generated sufficient proceeds to satisfy the $126,000 in reinstated fees as agreed to by the plaintiffs and that they had no obligation under the terms of the 2019 agreement to share in any shortfall that prevented a full reimbursement of the plaintiffs' basis in the property. The plaintiffs took the position that the "net profit" calculation, if made in accordance with the intent of the 2019 agreement, resulted in a negative number or "losses," which the parties had intended to share at the same percentages that they would have shared with respect to net profits.

On December 24, 2019, in anticipation of litigation to resolve the parties' dispute, the plaintiffs filed with the court an application for a prejudgment remedy, which subsequently was served on the defendants. The application sought to attach $324,824 in assets of the defendants, which is the amount that the plaintiffs calculated that they were owed by the defendants as their share of the net loss from the sale of the property.[6]

The plaintiffs later commenced the present action by service of process on March 13, 2020. In their one count initial complaint, the plaintiffs characterized the 2019 agreement as a "joint venture agreement" in which the parties had agreed to share fully in both profits or losses associated with the redevelopment and sale of the property. The plaintiffs alleged that the defendants had breached the 2019 agreement by refusing to accept responsibility for their share of the net loss of the rede-

velopment project. According to the plaintiffs, each defendant owed the plaintiffs $162,412.

The defendants filed a joint answer in which they denied the substantive allegations of the complaint and asserted a counterclaim against the plaintiffs for breach of contract. According to the defendants, the parties did not intend by entering into the 2019 agreement that the defendants would be responsible for sharing in any and all losses resulting from the sale of the property. The defendants alleged that the plaintiffs breached the parties' agreements by "fail[ing] to pay the defendants in accordance with the schedule for the payment as set forth in the [2019 agreement] as intended by the parties," which entitled each defendant to a payment of $63,000 from the sale proceeds, the amount of the reinstated fees.

The defendants also filed their own application for a prejudgment remedy. They argued that there was probable cause that they would prevail on their counterclaim against the plaintiffs and sought permission to attach real and personal property of the plaintiffs in the amount of $126,000.

The plaintiffs, thereafter, filed the operative amended complaint in which they added a second count that sought reformation of the 2019 agreement. Specifically, the plaintiffs asked the court to reform the term "funds," as used in the previously quoted Section 7, to read "profits," which is defined in the agreement to mean "net profits." The plaintiffs maintain that reformation is necessary so that the contract's language conforms to the actual intention of the parties to share in both potential profits or losses.

The court conducted a remote hearing on the parties' competing applications for prejudgment remedies over two days, beginning on March 23, 2021, and ending on April 5, 2021. The court heard testimony from Indre L. Johnson and Vita. The parties also each submitted various documentary evidence. At the close of evidence, the court instructed the parties to file simultaneous postargument briefs followed by simultaneous reply briefs. Briefs and reply briefs were filed by both parties, following which the court issued a memorandum of decision in which it granted the defendants' application for a prejudgment remedy and denied the plaintiffs' application for a prejudgment remedy.

In its analysis, the court first agreed with the defendants that there is no ambiguity in the contract language and that, read as a whole, it does not require the defendants to share in the loss attributed to the sale of the property. The court rejected the plaintiffs' contrary assertion that the contract unambiguously provides for loss sharing, characterizing it as "not viable." The court made note of the language in Section 7 that provides that the "Owner, Architect and Builder will share in all

Profits (as hereinafter defined) *and all losses* associated with the Property as set forth herein." (Emphasis added.) The court, however, rejected the plaintiffs' view that this language is an unambiguous statement about the parties' intent to share in both profits and losses or that it imparts any ambiguity into the contract. Rather, the court deemed it significant that "the term 'profits' is meticulously defined" but that "the agreement is notably silent in defining the term 'losses.' Following the extensive list of expenses that would be used to arrive at a 'net profit,' the parties chose to refer to a distribution of remaining 'funds.' The court cannot rewrite the agreement, and it cannot import any definitional term."[7]

Although the court first concluded that there was no ambiguity in the contract regarding the sharing of losses, it went on to conclude in the alternative that, even if there is ambiguity in the 2019 agreement, "the more credible evidence decidedly leads to an interpretation favoring the defendants." In other words, the parol evidence also supported a conclusion that the contract could not be interpreted reasonably to require the sharing of losses.

The court explained: "In September, 2017, the parties entered into the original construction contract. Very soon thereafter, the defendants agreed to a substantial fee reduction, from $197,000 to $134,000 each. Construction was not completed and the home was not listed until February, 2019. By that time, the residential market had darkened. The 2019 agreement specified that the architect, Vita, would have increased responsibility in marketing the property. The court finds that he substantially fulfilled those new duties. But what the court believes is even more telling concerns the continued evolvement of the fee structure of the defendants. While the 2019 agreement provided for a fee reinstatement of $63,000 for each defendant, as an 'above the line' expense, the defendants now agreed to put their remaining $134,000 each as a 'below the line' fund distribution payable only after a calculation of the 'net profit.' In short, the defendants agreed to take on a substantial risk (here, a risk and a loss that materialized) that they would never recover those monies. The plaintiffs' position, then, that they would have never agreed to a fee reinstatement unless the defendants had concomitantly agreed to share in losses is without merit. In fact, the defendants had already agreed to 'share the pain' as the market worsened." The court concluded: "[T]he plaintiffs have not shown probable cause that they will prevail in their action. The court denies their request for a prejudgment remedy . . . . The defendants have shown probable cause that they will prevail on their counterclaim and will recover damages of $126,000. The court grants their request for a prejudgment remedy in that amount . . . . The court also grants the defendants' motion for disclosure of

assets . . . and it orders that the plaintiffs comply with said motion within thirty days." This appeal followed.[8]

The plaintiffs claim on appeal that the court improperly granted the defendants' application for a prejudgment remedy. The plaintiffs' claim is twofold. They first claim that the court improperly determined that the 2019 agreement unambiguously provided that the parties would share only in any profits realized from the sale of the redeveloped property, not losses. Second, they claim that the court relied on clearly erroneous factual findings in reaching its alternative conclusion that, even if the relevant contractual language is ambiguous, the extrinsic evidence offered by the parties favored the defendants' interpretation. We agree with both claims and address them in turn.

We begin our discussion by setting forth relevant legal principles, including our standard of review. As provided for in our prejudgment remedy statutes, General Statutes § 52-278a et seq., "[a] prejudgment remedy means any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant [or counterclaim defendant] in a civil action of, or affect the use, possession or enjoyment by [that party] of, his property prior to final judgment . . . . A prejudgment remedy is available upon a finding by the court that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or setoffs, will be rendered in the matter in favor of the plaintiff [or counterclaimant] . . . . Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. . . . The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. . . .

"As for our standard of review, [our Supreme Court has] stated: [An appellate court's] role on review of the granting of a prejudgment remedy is very circumscribed. . . . In its determination of probable cause, the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. . . . Under the clear error standard, we review the record with a heightened standard of deference that exceeds the level of deference afforded under the abuse of discretion standard and will overrule the granting of a prejudgment remedy only if we are left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omit-

ted.) *Valencis* v. *Nyberg*, 160 Conn. App. 777, 782–83, 125 A.3d 1026 (2015). Even under this deferential standard, however, our review of a trial court's conclusions regarding questions of law will be plenary. See *Levco Tech, Inc.* v. *Kelly*, 214 Conn. App. 257, 283, 279 A.3d 248, cert. denied, 345 Conn. 918,     A.3d    (2022).

Because the court's probable cause determination in the present case turned on its interpretation of the parties' contract, we turn next to a discussion of the law governing the construction of contracts. "[If] a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . [If] the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . Accordingly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . .

"[W]e accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . [If] the language is unambiguous, we must give the contract effect according to its terms. . . . [If] the language is ambiguous, however, we must construe those ambiguities against the drafter. . . . Moreover, in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous. . . .

"In ascertaining the intent of contracting parties, we are also mindful that a court's interpretation of a contract must also be informed by whether the terms of the contract are contained in a fully integrated writing. This is important because [t]he parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. . . . The parol evidence rule does not apply, however, if the written contract is not completely integrated. . . .[9]

"An integrated contract is one that the parties have reduced to written form and which represents the full and final statement of the agreement between the parties. . . . Accordingly, an integrated contract must be interpreted solely according to the terms contained therein. Whether a contract is deemed integrated oftentimes will turn on whether a merger clause exists in the contract. . . . The presence of a merger clause in a written agreement establishes conclusive proof of the

parties' intent to create a completely integrated contract and, unless there was unequal bargaining power between the parties, the use of extrinsic evidence in construing the contract is prohibited. . . .

"We long have held that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, *without any uncertainty as to the object or extent of such engagement*, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . . Although there are exceptions to this rule, we continue to adhere to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence. . . . Courts must always be mindful that parties are entitled to the benefit of their bargain, and the mere fact it turns out to have been a bad bargain for one of the parties does not justify, through artful interpretation, changing the clear meaning of the parties' words." (Citations omitted; emphasis added; footnote added; internal quotation marks omitted.) *EH Investment Co.*, *LLC* v. *Chappo*, *LLC*, 174 Conn. App. 344, 358–60, 166 A.3d 800 (2017); see also 2 Restatement (Second), Contracts § 204, comment (e), p. 98 (1981) ("[if] there is complete integration and interpretation of the writing discloses a failure to agree on an essential term, evidence of prior negotiations or agreements is not admissible to supply the omitted term"). With the foregoing principles in mind, we turn to the plaintiffs' claims on appeal.

I

The plaintiffs first claim that the court improperly determined that the 2019 agreement unambiguously provided that the parties would share only in any potential profits generated by the sale of the redeveloped property, not losses. According to the plaintiffs, the court's decision effectively ignores or reads out of the contract the parties' express inclusion of the term "losses" in expressing that the parties would "share in all [p]rofits . . . and all losses associated with the [p]roperty . . . ." The defendants counter that, read as a whole, the agreement is only susceptible to one reasonable interpretation; namely, that the parties intended only to engage in profit sharing. We agree with the plaintiffs that the 2019 agreement is ambiguous regarding whether the parties intended to share in all losses.

Whether contractual language is ambiguous presents a question of law subject to this court's plenary review. See *Cruz* v. *Visual Perceptions*, *LLC*, 311 Conn. 93,

101–102, 84 A.3d 828 (2014). To reiterate, "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citation omitted; internal quotation marks omitted.) Id., 103.

The language at issue in the present case is found in Section 7 of the 2019 agreement, the complete text of which we set forth previously in this opinion. Section 7 is entitled "Additional Fee and Profits/*Losses*." (Emphasis added.) Section 7 first provides that the plaintiffs, for due consideration, agree to pay the defendants the $63,000 that each defendant had agreed to give up in the fee reduction letter and that the plaintiffs "also agreed to offer profit sharing should profits exist after distribution according to the allocation outlined below." Section 7 then continues, in relevant part: "Owner, Architect and Builder will share in all Profits (as hereinafter defined) *and all losses* associated with the Property as set forth herein." (Emphasis added.) The section defines profits as net profits and sets forth how net profits will be calculated. Specifically, it provides that expenses associated with the acquisition and development of the property, including construction and sale related costs and fees, will be deducted from the sale proceeds, with "[a]ny remaining funds" after this allocation of expenses distributed following closing. Unlike the term "profits," the contract contains no definition for the term "losses." In fact, Section 7 is silent as to how the parties would treat a situation in which the proceeds from the sale of the property were insufficient to satisfy each of the enumerated categories of expenses. Nevertheless, the contract contains express language that the parties would "share in all [p]rofits . . . *and all losses* associated with the [p]roperty . . . ." (Emphasis added.) It is the parties' use of this language that creates an ambiguity as to how the parties intended to distribute funds in the event of a net loss rather than a net profit, the precise situation that they now face.

On the one hand, Section 7 could be read to suggest that any "losses" resulting from a lower than anticipated sale price simply would be allocated through the inability of the diminished sale proceeds to satisfy, in the order enumerated in the "waterfall," each category of expenses. Because reimbursement of the plaintiffs' $1,450,000 equity in the land was the last of these enumerated expenses, Section 7 could be read effectively to allocate the risk of a potential loss, with the greatest risk assigned to the plaintiffs. The waterfall could also

be read, however, to require a purely mathematical calculation of "net profit" that contemplates not fully satisfying each of the enumerated expense categories and thus potentially resulting in a negative number or "losses." Such losses could then be shared by the parties in accordance with the same percentages that would have applied if funds remained.

For purposes of our review, it is not relevant which of these scenarios is the more plausible or if there may be other logical readings of Section 7. Instead, what is important is that the parties, through express language, indicated that they would share in all profits *and all losses*, and their failure to define precisely what they intended by that language creates a clear ambiguity in the contract that necessitates looking beyond the four corners of the contract to determine the parties' intent.

The only way that the trial court properly could have construed the language of the contract as unambiguously providing only for the sharing of profits was either by ignoring the parties' inclusion of the phrase "and all losses" in the contract, which it is not permitted to do under our canons of contract construction, or by interpreting the contract as having effectively incorporated the concept of loss sharing, as it was understood by the parties, into the "waterfall" provision and the calculation of net profits, an explanation that the court failed to give. On the basis of our plenary review, we conclude that Section 7 of the 2019 agreement, read in context, reasonably could be interpreted as evincing the parties' intent to share only in profits, if any were realized from the sale of the redeveloped property, or their intent to share in both potential profits or losses. Because the contract language in Section 7, read as a whole, is susceptible to more than one reasonable meaning, it is ambiguous. The trial court's conclusion to the contrary, therefore, cannot stand as a basis for finding probable cause that the defendants will prevail on their counterclaim.

Our conclusion regarding the plaintiffs' first claim, however, does not end our discussion because the court also decided, in the alternative, that, even if the contract language is ambiguous, the court would reach the same result on the basis of the extrinsic evidence presented. We therefore turn to the plaintiffs' second claim challenging this independent basis for the court's decision.

II

The plaintiffs next claim that the court's alternative conclusion—that, even if the relevant contractual language is ambiguous, the extrinsic evidence offered by the parties favored the defendants' interpretation—was improper because, in reaching that conclusion, the court relied on a clearly erroneous factual finding. Specifically, the plaintiffs contend that the court incorrectly found that the defendants, in signing the 2019 agree-

ment, had placed at risk the $268,000 in fees owed to them under the construction contract as modified by the fee reduction letter whereas, in fact, the defendants had been paid those fees and they were never at risk. The defendants concede that the court misstated the facts but point to a "substantial body of evidence" in the record that demonstrates that the plaintiffs only offered profit sharing and "never contemplated the defendants paying for any losses." Because the court relied primarily on its erroneous factual finding in reaching its conclusion, not the evidence advanced by the defendants, we agree with the plaintiffs that the court's interpretation of the 2019 agreement was incorrect. Accordingly, a new hearing on the defendants' application for a prejudgment remedy is warranted.

In applying the clearly erroneous standard of review, "we focus on the conclusion of the trial court, *as well as the method by which it arrived at that conclusion*, to determine whether it is legally correct and factually supported." (Emphasis added.) *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 222, 435 A.2d 24 (1980). Here, the court arrived at its conclusion that the parties had not intended to share in potential losses based on its finding that the defendants, by agreeing to the "waterfall" provision of the 2019 agreement, had, in fact, placed in jeopardy the entirety of their fee. Because the defendants had already accepted that level of risk, the court reasoned, it was unlikely that the defendants would have agreed to share in the possibility of additional losses in the manner suggested by the plaintiff. It was on this basis that the court agreed with the defendants' reading of the contract.

The court's finding regarding the defendants' risk, however, is not supported by the record. The court found that the defendants had "agreed to take on a substantial risk" by agreeing to place their $268,000 in "remaining" fees "below the line" and thus payable "only after a calculation of the 'net profit.'" The court also characterized the risk taken as a "risk and a loss that materialized." There is no dispute, however, that the $268,000 in fees owed under the construction contract as modified by the fee reduction letter never were at risk and, in fact, were paid in full to the defendants. It was only the $126,000 in reinstated fees that the defendants were not paid up front, and those fees were to be paid out in accordance with the waterfall provision; they were not a "below the line" item and were to be paid as part of the calculation of net profits, not after.[10]

The defendants conceded the court's factual error at oral argument before this court. Although the defendants hope to explain away the court's error as inconsequential given other extrinsic evidence presented at the hearing, the problem is that there is no indication in the court's decision to what extent, if any, the court

considered or credited any other extrinsic evidence. Furthermore, even if we were to assume that the court relied on other evidence in reaching its decision, this would be of no avail to the plaintiffs because the trial court's assessment of this evidence would have been viewed through the lens of its erroneous assessment of the level of risk the defendants had undertaken.

Given the court's erroneous determination that the contract was unambiguous regarding the parties' intent to share in potential losses and its reliance on clearly erroneous factual findings in reaching its alternative conclusion that the extrinsic evidence presented favored the defendants' interpretation of the contract, we are left with no confidence in the court's assessment of probable cause that the defendants will prevail on their counterclaim. Accordingly, the prejudgment remedy awarded cannot stand, and we remand the case to the court for a new hearing on the defendants' application for a prejudgment remedy.

The judgment is reversed with respect to the granting of the defendant's application for a prejudgment remedy and the case is remanded with direction to hold a new hearing on that application; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Although the plaintiffs indicated on their appeal form that they also sought to appeal from the court's judgment denying their own application for a prejudgment remedy, the plaintiffs have not raised or briefed any claim of error as to that aspect of the court's ruling and, thus, have abandoned any such claim. See *Deutsche Bank National Trust Co.* v. *Bertrand*, 140 Conn. App. 646, 648 n.2, 59 A.3d 864, cert. dismissed, 309 Conn. 905, 68 A.3d 661 (2013).

[2] As reflected in the opening paragraph of the 2019 agreement, the term "Owner" refers to the plaintiffs, "Architect" refers to the defendant Vita Design, and "Builder" refers to the defendant Vita Built.

[3] The phrase "to reinstate the fee reduction" is a non sequitur under the circumstances of this case. Reinstating a fee reduction logically means giving effect again to a reduction in fees, which would mean *lowering* the fees due to the defendants. As is readily apparent from the concluding clause of this sentence, however, the plaintiffs actually were agreeing to *increase* the amount of the fees owed to the defendants by reinstating the fees that the defendants previously had agreed to forgo in the fee reduction letter. In other words, read in context, the plaintiffs were offering to *rescind*, not reinstate, the fee reduction.

[4] The enumerated expenses listed in Section 7 of the 2019 agreement are as follows: "a) a mutually agreed percent real estate commission and staging expenses; b) state and local conveyance taxes; c) reasonable attorney's fees for the sale of the Property; d) the payoff of the note and mortgage to the Owner's construction lender; e) any reimbursements to Owner for build costs (including, but not limited to: surveying, appraisal fees, architecture, plans, engineering, tree removal and other landscaping expenses, site planning, construction costs and materials, utility expenses, maintenance and upkeep expenses for the Property); [and] f) construction loan interest, builder's risk and general liability insurance premiums for the Property, and real estate taxes and sewer use charges for the Property incurred by the Owner from the date the Owner vacated the Property to the time of the closing, adjusted on a per diem basis . . . ."

[5] The parties refer to this as the "waterfall" provision, with the proceeds generated from the sale of the property intended to flow from the top of the enumerated list of deductions to the bottom, paying each category in full and in order. As drafted, at the very bottom of the waterfall is the plaintiffs' $1,450,000 basis in the property, meaning that this is the item most likely left unsatisfied, at least in part, if the property sells for less than

anticipated. Any proceeds remaining after the "waterfall" distribution would, according to the 2019 agreement, be the "net profits" subject to the 20/40/40 disbursement provision.

[6] This figure is equal to 80 percent of the $563,530 purported loss less $126,000, which was the amount of the reinstated fees owed to the defendants.

[7] Although count two of the operative amended complaint sought to reform the 2019 agreement and, specifically, its use of the word "funds," the court, in denying the plaintiff's application for a prejudgment remedy, concluded that the plaintiffs had failed to show probable cause for a reformation under the circumstances presented. The court stated: "Reformation is appropriate in cases of mutual mistake—that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. . . . The evidence does not support a basis for the reformation of this agreement. The plaintiffs have not demonstrated that there was a mistake common to both of the parties. In fact, the plaintiffs' very own allegations suggest otherwise by stating that the reference to 'funds' rather than 'profits' may have been the result of a euphoric oversight and/or the simple scrivener's error. There was no evidence to support that the defendants signed the 2019 agreement because of any gross misconception. Likewise, the evidence demonstrated that it was the plaintiff Indre Johnson who drafted the agreement; further, the evidence showed that she was thorough in her drafting of it." (Citations omitted; footnote omitted; internal quotation marks omitted.)

[8] After the granting of their application for a prejudgment remedy and the filing of this appeal, the defendants amended their counterclaim to include additional counts alleging a breach of the implied covenant of good faith and fair dealing and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.

[9] "[I]t is well established that the parol evidence rule is not a rule of evidence, but a substantive rule of contract law that bars the use of extrinsic evidence to vary [or contradict] the terms of an otherwise plain and unambiguous contract. . . . The rule does not prohibit the use of extrinsic evidence for other purposes, however, such as to prove mistake, fraud or misrepresentation in the inducement of the contract." (Citation omitted; internal quotation marks omitted.) *Zhou* v. *Zhang*, 334 Conn. 601, 620–21, 223 A.3d 775 (2020); see also *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288–89, 589 A.2d 329 (1991) (explaining that, although use of parol evidence is disallowed if offered solely to vary or contradict written terms of integrated contract, parol evidence is permitted "(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud" (internal quotation marks omitted)). A party's failure to object to evidence on the ground that it is inadmissible pursuant to the parol evidence rule does not preclude us from considering on appeal whether a court's reliance on such evidence was proper. See *Capp Industries, Inc.* v. *Schoenberg*, 104 Conn. App. 101, 110 n.6, 932 A.2d 453, cert. denied, 284 Conn. 941, 937 A.2d 696 (2007).

[10] The court's description of some items being "above the line" and others "below the line" is simply incongruous with the express language of the waterfall provision, which contemplated the payment of all enumerated expenses, including the $126,000 in reinstated fees, as part of the calculation of net profits.